NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
KEITH STOUCH and ROSEMARY               :
STOUCH, his wife,                       :
                                        :
        Plaintiffs,                     :        Civil Action No. 03-6048 (JAG)
                                        :
        v.                              :        **OPINION**
                                        :
THE TOWNSHIP OF IRVINGTON, THE          :
IRVINGTON POLICE DEPARTMENT,            :
CHIEF MICHAEL CHASE, DIRECTOR           :
MICHAEL DAMIANO and JOHN DOES           :
1-10, all jointly, severally and individually,  :
                                        :
        Defendants.                     :
_____:


**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motions of Defendants Michael Damiano

("Damiano"); and Michael Chase ("Chase"), the Township of Irvington (the "Township"), and

the Irvington Police Department (the "PD") (collectively "Defendants"), seeking summary

judgment, pursuant to FED. R. CIV. P. 56.  For the reasons set forth below, both motions are

granted.

### I.  PROCEDURAL HISTORY

On December 19, 2003, Plaintiffs Keith Stouch ("Stouch") and his wife, Rosemary

Stouch (collectively "Plaintiffs"), filed a complaint against Defendants Chase, the Township, and

the PD.  (See generally Compl.)  Plaintiffs alleged violations of 42 U.S.C. § 1983 (2008); the

1

Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101-12213 (2008); the New Jersey Law Against Discrimination (the "NJLAD"), N.J. STAT. ANN. §§ 10:5-1 to -49 (2008); and the New Jersey Conscientious Employee Protection Act (the "CEPA"), N.J. STAT. ANN. §§ 34:19-1 to -14 (2008). (Id. at 1-2.) Plaintiffs also asserted violations of New Jersey state common law. (Id. at 2.) Specifically, Plaintiffs claimed that Defendants Chase, the Township, and the PD:

1. retaliated against Stouch for engaging in protected speech, in violation of the First and Fourteenth Amendments of the Constitution of the United States ("First Amendment retaliation claim"), the Americans with Disabilities Act ("ADA retaliation claim"), the New Jersey Law Against Discrimination ("NJLAD retaliation claim"), and the New Jersey Conscientious Employee Protection Act ("CEPA retaliation claim");

2. created a hostile workplace, in violation of the New Jersey Law Against Discrimination ("NJLAD hostile work environment claim");

3. discriminated against Stouch based on his disability, or perceived disability, in contravention of the Americans with Disabilities Act ("ADA disability discrimination claim"), and the New Jersey Law Against Discrimination ("NJLAD disability discrimination claim");

4. deprived Stouch of his due process rights, pursuant to the Fifth and Fourteenth Amendments of the Constitution of the United States ("due process claims");

5. conducted an unlawful search, in violation of the Fourth Amendment of the Constitution of the United States ("Fourth Amendment privacy claim");

6. conspired to discriminate and retaliate against Stouch ("civil conspiracy claim");

7. interfered with Stouch's and Rosemary's economic opportunities ("tortious interference with economic opportunity claim");

8. negligently hired, supervised, and retained the employees of the PD ("respondeat superior claim"); and

2

9.    deprived Rosemary of her husband's companionship ("loss of consortium claim").

(See generally Compl.)  Plaintiffs amended their complaint on January 8, 2004, and added Michael Damiano, Director of the Irvington Police Department, as a defendant.  (First Am. Compl. ¶¶ 13, 53.)

Defendants filed separate answers to Plaintiffs' First Amended Complaint, (see generally Def. Damiano's Answer (Docket Entry No. 13); Defs. Township of Irvington's and Irvington Police Department's Answer (Docket Entry No. 14); and Def. Chase's Answer (Docket Entry No. 15)), and the parties conducted extensive discovery.  On October 15, 2007, Defendant Damiano filed a motion for summary judgment arguing that summary judgment should be entered in his favor because he had no personal involvement in the alleged wrongs of which Plaintiffs complain, and he has no knowledge of an alleged motive to violate Plaintiffs' civil rights.  (See generally Def. Damiano's Mot. for Summ. J. ("Damiano Mot.").)  Defendants Chase, the Township, and the PD also filed a motion for summary judgment.  (See generally Defs. Chase's, Township of Irvington's, and Irvington Police Department's Mot. for Summ. J. ("Twp. Mot.").)  Defendant Damiano joined their motion.  (Damiano Mot. 3.)

On December 31, 2007, Plaintiffs responded, in a single brief, to Defendants' motions. (See generally Pls.' Resp. to Defs.' Joint Mot. for Summ. J. ("Pls.' Resp.").)  Only Defendant Damiano filed a reply.  (See generally Def. Damiano's Reply to Pls.' Opp'n to Defs.' Joint Mot. for Summ. J.

## II. <u>FACTUAL BACKGROUND</u>[1]

Plaintiff Stouch began his employment with the Irvington Police Department in

August of 1994.[2]  (Damiano SMF ¶ 1; <u>see</u> <u>also</u> Defs. Township of Irvington's, Irvington

Police Department's, and Chase's Statement of Undisputed Facts ("Twp. SMF") ¶ 1; JDS  Ex.

P at 142:18-20.)  Immediately, Stouch began "speaking out" about the administration of the

PD, as well as alleged violations of police policies and various laws.  (Twp. SMF ¶ 2; <u>see</u> <u>also</u>

JDS Ex. P at 11:11-18; Stouch Certification ¶ 2.)  Stouch declared that "I never hid anything I

had to say.  If I had to say it, I said it."  (JDS Ex. B 79:1-2.)  Specifically, Stouch voiced

---

[1] In compliance with L. CIV. R. 56.1, Defendants included a "Statement of Undisputed Material Facts" in both motions for summary judgment.  Plaintiffs did not include such a statement.  In addition, Plaintiffs do not provide adequate citation to the record, which consists of over 880 pages.  In fact, many of the record references are inaccurate.  "Judges are not like pigs, hunting for truffles buried in the record." <u>Doeblers' Pa. Hybrids, Inc. v. Doebler</u>, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (internal quotation omitted); <u>see</u> <u>also</u> <u>Ober v. Miller</u>, No. 04-1669, 2007 U.S. Dist. LEXIS 93236, at *3 n.2 (M.D. Pa. Dec. 18, 2007) ("Constructing the facts of the instant case was further complicated . . . by the inappropriate record citations throughout [plaintiff's] responsive statement of material facts.").  Therefore, this Court will deem Defendants' uncontested facts as admitted, unless disputed by Plaintiffs in their brief and supported by the evidence.  <u>See</u> <u>Scott v. Bd. of Educ. of the City of E. Orange</u>, No. 01-4171, 2006 U.S. Dist. LEXIS 93723, at *3-5 (D.N.J. Dec. 12, 2006) (adjudicating motions for summary judgment despite plaintiff's failure to submit a statement of uncontested material facts in compliance with L. CIV. R. 56.1, and deeming uncontested facts as admitted); <u>Longoria v. New Jersey</u>, 168 F. Supp. 2d 308, 312  n.1 (D.N.J. 2001) ("treat[ing] facts appearing in the Defendant's Rule 56.1 statement as admitted by [the plaintiff], unless disputed by [the plaintiff] in his briefs or contradicted by the evidence.").

[2] Defendant Damiano joined the PD in 1968.  (Damiano SMF ¶ 2; <u>see</u> <u>also</u> Joint Defense Submission ("JDS") Ex. O at 34:4-5; JDS Ex. T at No. 8.)  When Stouch started with the PD, Damiano had reached the rank of Captain, and was Stouch's commanding officer.  (Damiano SMF ¶¶ 3-4; <u>see</u> <u>also</u> JDS Ex. P at 142:20-143:7.)  After approximately one year, Damiano became the shift commander for another shift, and no longer directly supervised Stouch. (Damiano SMF ¶ 6; <u>see</u> <u>also</u> JDS Ex. P at 144:3-15.)  Damiano retired in December of 1999, but returned to the PD as Police Director on July 1, 2002.  (Damiano SMF ¶ 2; <u>see</u> <u>also</u> JDS Ex. O at 34:5-7; JDS Ex. T at No. 8.)

concerns about: 1) an incident involving Sergeant Marshall Reiter; 2) officers falsifying time sheets; 3) the application of the PD's sick and injured leave policy; 4) the conditions of the Communications Center; 5) enforcement of the PD's grooming policy; and 6) an incident involving Officer Brian Rice. The gravamen of Stouch's claims is that he was ultimately terminated from the PD as a result of his complaints.

**A.     Sergeant Marshall Reiter**[3]

Plaintiff Stouch complained first about Sergeant Marshall Reiter's misuse of parking spaces located near the PD. Stouch lamented that Sergeant Reiter parked his car, every evening, in a handicap parking space although he was not handicapped. (JDS Ex. B at 13:14-14:7.) Stouch criticized Sergeant Reiter about this practice and was told that he was, essentially, taking his position too seriously. (Id. at 12:2-22.)

On December 1, 1997, Sergeant Reiter parked again in a handicap parking space near the police station. (Id. at 21:17-19.) After being verbally reprimanded by Sergeant Reiter for coming into work too early, Stouch went outside and ticketed Sergeant Reiter's vehicle. (Id. at 14:15-16:6.) The ticket ultimately was dismissed by the prosecutor, and Stouch complained to Sergeant Tavares, of the PD's Internal Affairs Division ("Internal Affairs"), about the dismissal. (Id. at 25:14-26:2.) As a result of Stouch's protests, Steven Palamara, then Director and Chief of Police, admonished Sergeant Reiter's conduct. (Id. at 32:6-33:14.) However, Stouch was not satisfied with the resolution of his complaints because he was not personally informed about the investigation into Reiter's conduct, or the resulting disciplinary

---

[3] Parenthetically, Defendant Damiano has no knowledge regarding Stouch's complaints involving Sergeant Reiter. (Damiano SMF ¶ 10; see also JDS Ex. T. at No. 8.)

action.  (<u>Id.</u> at 33:15-34:2.)

**B.      Time Sheet Falsification**[4]

Stouch next claimed that "[t]ime sheets of superior officers were falsified to make it appear as if they were out on calls when they were not. [He maintained that s]ubordinate officers were routinely ordered to falsify reports." (Stouch Certification ¶ 6.)  Stouch also testified that "there is a policy that Officers with seniority do not respond to 911 calls nor take reports.  I know of instances where there were domestic disputes, fights and worse and officers were available to assist but did nothing since they had reached their seniority level." (<u>Id.</u> at ¶ 4.)

Specifically, Stouch alleged that Sergeants Gargas, Reiter, Tomich, Healy, Borshuck, Bork, and Massimino used computer records, in the PD's dispatch room, to complete daily logs indicating what stops were made during their patrol.  (JDS Ex. B at 111:9-115:8.)  He claimed that these officers completed the logs although they had not, in fact, been present at any of the stops recorded.  (<u>Id.</u> at 121:19-24.)  Stouch witnessed these sergeants transcribing patrol stop information on their daily logs while he worked in the Communications Center; however, Stouch could not say, with certainty, that each time a sergeant completed a log it contained false information.  (<u>Id.</u> at 121:1-124:2.)

Stouch "complained openly, [and] spoke what was on [his] mind," regarding these officers' alleged practice.  (<u>Id.</u> at 127:4-5.)  Stouch also discussed his concerns with Chief of Police Michael Chase.  (<u>Id.</u> at 127:5-7.)  He did not complain to anyone else.  (<u>Id.</u> at 127:12-

---

[4] Defendant Damiano was not aware that Stouch complained that supervisors had falsified attendance reports, or that officers had failed to respond to 911 dispatch calls.  (Damiano SMF ¶ 19; <u>see also</u> JDS Ex. O at 15:14-21, 16:3-9.)

128:20.)

**C.      Standard Operating Procedure 1:13 - - Procedures and Requirements for Sick Leave & Injured on Duty Leave**

Stouch also criticized Standard Operating Procedure ("S.O.P.") 1:13, the PD's sick and injury leave policy.  This policy was created as a result of a negotiated collective bargaining agreement between the PD and its union.  (JDS Ex. E at 1) ("Policy a product of negotiation between the Township and PBA Local 29 / Irvington SOA . . . . ")  The PD's Internal Affairs Division, operating at the direction of the police chief, is responsible for enforcing this policy. (Damiano SMF ¶ 16; see also JDS Ex. O at 23:5-8, 24:2-9.)

S.O.P. 1:13 requires, inter alia, the following notifications:

Before an officer leaves his or her place of recuperation for any reason and upon his or her return, a telephone notification to (201) 399-1786, [a] telephone equipped with caller ID and recorded with a time and date stamp[,] is required. The officer shall state the time he or she is making the call and the place the officer is going.  Caller ID "blocked calls" and cellular telephone calls will not satisfy this requirement.

. . . .

Officers absent for five (5) days or more must submit a written report each week indicating their present condition, physician name and appointments they have attended, the prognosis provided by their attending physician, and their estimated recovery date.

Officers absent for more than 30 calendar days on SL or IOD require a form to be completed[,] furnished by the police department[,] from their attending physician stating their condition, limitations for limited duty assignments and prognosis. This form will be required for each 30 days of absence.

Officers with non-debilitating medical conditions which require special accommodations will also be required to submit an attending physician letter for each 30 days the special accommodation is required.

(JDS Ex. E at 2-3.)  In addition, S.O.P. 1:13 states that "[o]fficers are required to remain at

their place of recuperation during the sick leave," except for eight enumerated reasons, which include attending doctor appointments.  (Id. at 2.)  Finally, this policy authorizes the PD to perform "sick checks" at an officer's home, or other place of recuperation.  (Id. at 5.)

On August 23, 2000, Stouch was involved in a car accident, while in pursuit of another vehicle during his patrol.  (Twp. SMF ¶ 4; see also JDS Ex. P at 54:24.)  Stouch was injured, and took leave, pursuant to S.O.P. 1:13.  (Twp. SMF ¶ 4; see also JDS Ex. P at 54:24-55:6.)  In January 2001, Stouch had neck surgery for the injuries sustained from the August 2000 car accident, and was out on leave for approximately three months.  (JDS Ex. P at 71:2-8.)

"In August 2002, Stouch was re-injured[, and had] two spinal fusion surgeries between August 2002 and January 2003."  (Twp. SMF ¶ 6; see also JDS Ex. P at 73:1-16.)  These surgeries caused Stouch to seek leave, pursuant to S.O.P. 1:13, through approximately May of 2003.  (Twp. SMF ¶ 7; see also JDS Ex. P at 73:17-20.)  During each of Stouch's leaves of absence he complied with S.O.P. 1:13, and filed regularly five-day and thirty-day written reports.  (See generally JDS Ex. EE; see also Twp. SMF ¶ 16.)

On October 2, 2002, Sergeant Gargas conducted "sick checks" for three officers listed as being on leave, pursuant to S.O.P. 1:13.[5]  (JDS Ex. F at 1.)  Before Sergeant Gargas arrived at Stouch's home, Stouch left a voicemail message with Internal Affairs.  (Id.)  Stouch's message indicated that he would be leaving his home to attend a doctor appointment.  (Id.)  Sergeant Gargas did not receive this message prior to visiting Stouch's home, and was not aware that Stouch would not be present for the "sick check."  (JDS Ex. F at 1; see also JDS

_____

[5] Stouch told Damiano that marked police cars had come to his home to enforce S.O.P. 1:13; however, Damiano did not order the officers to perform the "sick check," or oversee their visit.  (Damiano SMF ¶ 15; see also JDS Ex. T at No. 17.)

8

Ex. CC.)  However, after learning that Stouch had complied with the notification requirement, Sergeant Gargas made a notation on his report reflecting that, although Stouch was not present for the "sick check," he had complied with S.O.P. 1:13.  (JDS Ex. F at 1.)

Despite Sergeant Gargas' report, Stouch resented the PD for unequally enforcing the sick leave policy.  (JDS Ex. B at 180:9-11) ("[T]here [were] a couple of officers that were out for extended time under [the] sick policy and things weren't enforced . . . . ")  He stated, "I pretty much complained about a lot of [officers not complying with] the sick policy."[6]  (Id. at 180:15-16.)  Thereafter, Stouch advised the PD, in writing, that he had posted "No Trespass" signs on his property, and that no members of the PD were permitted entry without his, or his wife's, prior approval.  (JDS Ex. CC; see also JDS Ex. C at 393:20-396:9.)  Stouch's wife, Rosemary, also filed a trespassing complaint on October 10, 2002.  (JDS Ex. F at 6.)

**D.      Communications Center Assignment**

In addition to the complaints listed above, Stouch raised concerns about the conditions of the Communications Center[7] at the PD.  (JDS Ex. P at 60:2-4) ("I didn't mind doing the communications work but I wasn't happy about the condition of the communications room itself.")  Stouch alleged that the room had poor ventilation and air conditioning, mold, and a bug infestation.  (JDS Ex. A ¶ 21(g).)

Stouch was first assigned, by Chief Chase, to the Communications Center after

---

[6] Damiano has no knowledge of Stouch's complaints regarding the application of the sick leave policy to injured employees, or that such policy was unfairly enforced.  (Damiano SMF ¶ 14; see also JDS Ex. T at No. 14; JDS Ex. O at 17:23-18:6.)

[7] The Communications Center facilitates the intake of 911 calls, and the dispatch of officers in response to those calls.  (JDS Ex. P at 59:19-24.)

9

returning from a leave of absence in approximately March of 2001.  (Twp. SMF ¶ 5; <u>see also</u> JDS Ex. P at 59:8-9, 59:21-24.)  This assignment complied with each of the restrictions Stouch's treating physician imposed.  (Twp. SMF ¶ 5; <u>see also</u> JDS Ex. P at 64:24-66:8.)  Stouch was assigned again to the Communications Center in May of 2003, after recovering from two spinal fusion surgeries.  (Twp. SMF ¶ 7; <u>see also</u> JDS Ex. P at 73:19-25.)

Stouch complained to Damiano about the poor conditions in the Communications Center, and Damiano assured Stouch that his concerns were being addressed.  (Damiano SMF ¶ 20; <u>see also</u> JDS Ex. P at 146:15-25.)  At some point, the air conditioner was replaced, and a study was conducted to identify problems.  (JDS Ex. P at 147:2-15.)  The State of New Jersey also issued a report citing the PD for poor air quality in the Communications Center, and ordered the PD to remedy the defect, as well as other shortcomings in the building.  (<u>Id.</u> at 77:22-78:4.)

However, Stouch remained dissatisfied, and ultimately filed a complaint with the Occupational Safety and Health Administration in July of 2003.  (<u>Id.</u> at 77:1-6.)

**E.      Standard Operating Procedure 1:11 - - Uniform and Dress Policy**

Next, Stouch objected to S.O.P. 1:11, also known as the PD's grooming policy, being enforced against him unfairly.  (JDS Ex. P at 37:14-38:11.)  As a result, Stouch purposefully violated S.O.P. 1:11.  (<u>Id.</u> at 38:9-11 ("I felt that if the policy - - if they could violate the policy then I could grow a goatee as well."); <u>see also</u> <u>id.</u> at 39:4-5.)

S.O.P. 1:11 states, in reference to the PD's policy on exhibiting facial hair, that "[t]he face shall be clean shaven unless a shaving waiver is authorized by the Division Commander or Chief.  Mustaches are authorized but shall be kept neatly and closely trimmed. . . .

Handlebar mustaches, goatees, beards or eccentricities are not permitted." (JDS Ex. W at 2 (emphasis added).) The policy permits exceptions for religious reasons. (Id.)

On July 26, 2002, Stouch appeared for duty visibly displaying a goatee. (JDS Ex. GG at 1.) Lieutenant Donald McDougall gave Stouch a verbal order to remove the goatee by the next day, and Stouch refused. (Id.; see also JDS Ex. P at 41:25-43:13.) Lieutenant McDougall filed a report regarding the incident. (JDS Ex. GG at 3.) After receiving the report, Captain George Venturi sent a memorandum to Deputy Chief Steven Palamara,[8] advising the Deputy Chief of the incident, as well as the failure of the PD to enforce the policy consistently. (Id. at 1-2.) Captain Venturi recommended that Stouch be disciplined for his defiance of a verbal order by a superior, despite the inconsistent enforcement of the policy. (Id. at 2.)

## F.    Officer Brian Rice

Finally, Stouch complained that on July 11, 2003, while working in the Communications Center, Officer Brian Rice cursed at, and threatened, him.[9] (JDS Ex. H.) Internal Affairs investigated the incident, took several written witness statements, and interviewed individuals with knowledge of the encounter. (JDS Ex. I.)

On July 16, 2003, Stouch filed a criminal complaint against Officer Rice, and a trial was scheduled for October 29, 2003. (JDS Ex. J.) Stouch did not return to work after July 22, 2003. (Twp. SMF ¶ 26.) Chief "Chase [then] removed Rice's weapon, [and] placed him on

---

[8] Plaintiff Stouch claims that Steven Palamara was demoted from Chief of Police to Deputy Chief of Police. (JDS Ex. P at 122:11-14.)

[9] Defendant Damiano has no knowledge of this incident. (Damiano SMF ¶ 18; see also JDS Ex. T at No. 18.)

modified duty assignment pending the outcome of the trial . . . . " (Twp. SMF ¶ 25.)  Officer

Rice was acquitted of the charges; however, "prior to re-arming Rice, Chase sent Rice for a

psychiatric fitness for duty examination."  (Twp. SMF ¶ 25; see also JDS Ex. K.)

**G.      Administrative Actions**

"On or about August 20, 2003, Chase received notification that Stouch was under the

care of Dr. Lawrence Eisenstein, a psychiatrist, who was treating Stouch for 'Chronic [Post-

Traumatic Stress Disorder]' . . . [and had] prescribed Zoloft and Ambien."  (Twp. SMF ¶ 27;

see also JDS Ex. M.)  Prior to receiving this notification, Stouch had not submitted any

written reports regarding his absence.  (JDS Ex. AA at 1, 3-4.)  As a result of his failure to

comply with S.O.P. 1:13, Internal Affairs began an investigation.  (Twp. SMF ¶ 28.)

During the investigation, Chief Chase ordered Stouch to "relinquish his weapon

pending a fitness for duty examination."  (Twp. SMF ¶ 29; see also JDS Ex. AA at 1.)  When

Stouch refused, Chase sent officers to Stouch's home to retrieve the weapon.  (Twp. SMF

¶ 29.)  At the conclusion of the investigation, Chase signed a Preliminary Notice of

Disciplinary Action asserting that Stouch had violated S.O.P. 1:13, had acted insubordinate,

and had proved to be untruthful.  (JDS Ex. AA.)  Chase then ordered Stouch to be evaluated

for fitness for duty.  (Twp. SMF ¶ 30.)

On November 10, 2003, Dr. Alvin Krass, Ph.D., prepared a written report regarding

Stouch's psychological fitness for police work.  (Damiano SMF ¶ 21; see also JDS Ex. Z.)

Dr. Krass advised that Stouch was not fit to return as a police officer, stating that

> [i]t is my opinion that [Plaintiff] is not fit for return to work as a police officer
> based on this psychological evaluation. . . . [Plaintiff] is not fit for return to regular
> police duties . . . [and is] in need of continuing professional care.  His problems

appear to derive from longstanding psychological conflicts rather than from acute or more current traumatic events.

(Damiano SMF ¶ 21; see also JDS Ex. Z at 4.)

On November 17, 2003, Dr. John Motley, a psychiatrist, also submitted a written report to the PD. Dr. Motley diagnosed Stouch with paranoid and narcissistic personality disorders. (JDS Ex. X at 9.) As a result of his diagnosis, Dr. Motley stated that

[i]t is my psychiatric opinion, with reasonable medical probability, that Mr. Stouch's longstanding personality problems are such that he is and will continue to be a constant irritant to his supervisors and fellow officers. . . . [This] will continue to interfere in his ability to work cooperatively within the rules of his department.

(Id. at 10.) In addition, Dr. Motley noted that he "fail[ed] to see any justification for a diagnosis of Post-Traumatic Stress Disorder." (Id. at 10.)

Based on the reports of Dr. Krass and Dr. Motley, Stouch was served with a Preliminary Notice of Disciplinary Action on November 21, 2003, declaring that he was unable to perform his responsibilities as a police officer. (Damiano SMF ¶ 21; see also JDS Ex. R at 1.) Chief Chase signed the notice, and a hearing was scheduled for December 16, 2003 at 10:00 a.m. (Damiano SMF ¶ 21; see also JDS Ex. R at 1.) Stouch failed to appear at the hearing; however, the proceeding was conducted in his absence after the hearing officer determined that Stouch had been provided with sufficient notice. (Damiano SMF ¶ 22; see also JDS Ex. R at 45.) Reginald A. Long, Esq. presided over the hearing and, on December 31, 2003, ruled that "[t]he Irvington Police Department properly dismissed Officer Stouch since he is psychologically unfit to serve as a police officer." (JDS Ex. R at 45.)

Prior to receiving Mr. Long's decision, Stouch called Damiano on December 19, 2003,

and recorded the conversation.  (Damiano SMF ¶ 23.)  Stouch told Damiano that he heard that he had been fired.  (JDS Ex. S at 5:20-6:20.)  Damiano assured Stouch that he had not received or signed anything confirming Stouch's dismissal.  (Id. at 6:21-23.)  In fact, Damiano told Stouch that he believed that the hearing had been postponed, based on paperwork that had been forwarded to him.  (Id. at 6:23-7:4.)  Stouch also told Damiano that his intention was to retire from the PD, and seek a disability pension.  (Id. at 7:12-13.)  However, Stouch stated that his pension eligibility was uncertain because of the charges pending against him.  (Id. at 7:16-9:5.)  In response, Damiano asked if Stouch's attorney could negotiate an agreement with the pension board to resolve the matter.  (Id. at 7:23-8:2.)  Damiano then offered suggestions on ways to settle the dispute.  (Id. at 9:22-10:21.)  Damiano did not discuss this conversation with anyone at the PD.  (Damiano SMF ¶ 24; see also JDS Ex. O 44:25-45:5.)

On December 31, 2003, Damiano received from Sergeant Amanda Koontz of Internal Affairs, a Final Notice of Disciplinary Action indicating that, as a result of Mr. Long's administrative ruling, Stouch was terminated from the PD, effective immediately.  (Damiano SMF ¶¶ 25-27; see also JDS Ex. O at 47:20-48:25.)  Damiano was required to, and did, sign the notice in his capacity as the representative of the appointing authority.  (Damiano SMF ¶¶ 25-27; see also JDS Ex. O at 50:15-21.)

On January 2, 2004, Stouch again called Damiano and recorded the conversation. Damiano told Stouch that prior to receiving the Final Notice of Disciplinary Action, he did not know that the decision to terminate Stouch had been made, but that the decision was final. (JDS Ex. S at 5:8-11.)  Damiano stated that as the Police Director, he was required to sign the notice, but advised Stouch to pursue legal recourse.  (Damiano SMF ¶ 28; see also JDS Ex. S

14

at 6:9-15 ("But you'll do what you gotta do and - - and, you know, you keep pushing forward. But, I didn't make the charges, you know, the law requires that I sign off on these things, so. . . . There's just a procedure you gotta follow and just check with the attorneys . . . . ").)

Stouch then appealed the Final Notice of Disciplinary Action.  (Damiano SMF ¶ 31.) On October 26, 2006, Administrative Law Judge Edith Klinger ("ALJ Klinger") affirmed Stouch's dismissal from the PD.  (Damiano SMF ¶ 31; see also JDS Ex. U at 15 ("I CONCLUDE that Stouch was unfit for duty as a police officer prior to and including December 31, 2003 because he was unable for psychological reasons to conform his conduct to that required of a municipal police officer.  Consequently, I CONCLUDE that Stouch was correctly removed from his position on December 31, 2003 as being psychologically unfit for duty.").)

Stouch appealed ALJ Klinger's ruling.  (Damiano SMF ¶ 31.)  The Merit System Board of the State of New Jersey's Department of Personnel affirmed ALJ Klinger's decision, and issued a Final Administrative Action on February 1, 2007.  (Damiano SMF ¶ 31; see also JDS Ex. BB at 5 ("The Merit System Board finds that the appointing authority's action in removing the appellant was justified.  Therefore, the Board affirms that action and dismisses the appeal of Keith Stouch.").)

### III.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual

dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . . "  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . .  that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.") (emphasis in original) (internal citations omitted).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light

16

Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

"Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.

## IV.  DISCUSSION

**A.      Defendant Damiano Had No Personal Involvement in the Alleged Wrongs**

Defendant Damiano argues that his motion for summary judgment should be granted because Plaintiffs do not allege that he had any personal involvement in the alleged wrongs which constitute the basis for their claims.  (Damiano Mot. 2-3.)  In fact, Damiano asserts that he has no knowledge of any alleged violation of Plaintiffs' civil rights.  (See generally

Damiano SMF.)  Therefore, Damiano argues, summary judgment should be entered in his favor on Plaintiffs' claims pursuant to 42 U.S.C. § 1983, the NJLAD, the ADA, and civil conspiracy.  (Damiano Mot. 11-20.)  This Court finds Damiano's argument persuasive, and grants his motion for summary judgment.[10]

### 1.    *42 U.S.C. § 1983*

In order "[t]o impose liability on individual defendants[, pursuant to 42 U.S.C. § 1983], Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  Rode v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir. 1988).

In the case sub judice, Plaintiffs fail to allege that Damiano was personally involved in any of the violations asserted in their First Amended Complaint.  In fact, Damiano is mentioned only twice in 74 paragraphs.  (See First Am. Compl. ¶¶ 13, 53.)  At most, Plaintiffs claim that because "Damiano was with the Irvington Police Department from 1968 to 1999[,] and returned as Director in July of 2002 . . . [he] was aware of the problems complained about within the department.  As director, he allowed [] th[ese] problems to perpetuate and did not take steps to remedy them."  (Stouch Certification ¶ 15.)  This general statement, without more, however, does not provide this Court with an evidentiary basis to conclude that

---

[10] This Court grants Defendant Damiano's motion for summary judgment; however, the discussion regarding the disposal of the ADA claims appears in Section IV.B of this Opinion.

Damiano directed, had actual knowledge, or acquiesced to the violation of Plaintiffs' constitutional rights. <u>Rode</u>, 845 F.2d at 1208; <u>see also</u> <u>Smith v. O'Boyle</u>, 251 F. App'x 87, 89 (3d Cir. 2007) (stating that the plaintiff "cannot withstand a motion to dismiss because he did [not] make any specific allegations against [defendants], and liability cannot be imposed on the basis of respondeat superior.  Additionally, [defendants] were only involved in [the plaintiff's] grievance and appeals, and [the plaintiff] does not allege that they were personally responsible for the alleged constitutional deprivations."); <u>Nelson v. Hill</u>, 211 F. App'x 88, 89 n.3 (3d Cir. 2006) (summary judgment was proper because the plaintiff "failed to show personal involvement of" the superintendent, deputy warden, chief of security, and lieutenant); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1082 (3d Cir. 1976) ("We need not dwell at length upon the lack of derivative liability of the warden.  Even if liability had been established against the guards, there is not the slightest evidence showing that the warden had actual knowledge of the unanswered request for medical attention or that he acquiesced or participated in any denial.").

In addition, there is evidence to the contrary.  First, Defendant Damiano stated that he had no knowledge of Stouch's numerous complaints.  (<u>See</u> Damiano SMF ¶¶ 10-15, 18-20; <u>see also</u> JDS Ex. O at 15:6-21, 16:3-9, 17:23-18:6; JDS Ex. T at Nos. 8, 11-15, 17-20.) Second, Stouch's own testimony indicates that Damiano was added only because he signed Stouch's termination papers, and not because he retaliated or discriminated against Stouch in any way.  (JDS Ex. P at 159:13-160:6) ("Well, [Damiano] approved my termination.  That's basically the - - as Director it was my understanding that he was the authority that could sign those termination papers or not.  Based on our conversation that we had I thought that if

something came across his desk as he told me he would tell them that I was just looking to

pension out.  And he wouldn't allow them to do what they did to me in order to squash my

pension.").)  Finally, there is no other evidence connecting Damiano to any of the alleged

offenses of which Plaintiffs complain.

This Court finds that Director Damiano did not have the requisite personal

involvement necessary to sustain Plaintiffs' claims, pursuant to 42 U.S.C. § 1983.

### 2.    *New Jersey Law Against Discrimination*

Plaintiffs raise a number of claims under the New Jersey Law Against Discrimination,

including:  retaliation; hostile work environment; and discrimination based on Stouch's

disability, or perceived disability.  Defendant Damiano, however, argues that because he had

no personal involvement in any of the alleged wrongs, he cannot be found liable for any

violation of the NJLAD, even if the Township or the PD are found to have violated the statute.

(Damiano Mot. 15-16.)

This Court agrees that Defendant Damiano is not liable for potential violations of the

NJLAD.  While the NJLAD prohibits "any person, whether an employer or an employee . . . to

aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to

attempt to do so," N.J. STAT. ANN. § 10:5-12(e), each of the words used in the statute "require

active and purposeful conduct," Tarr v. Ciasulli, 853 A.2d 921, 928-29 (N.J. 2004) ("Aid

means to give help or assistance to; abet means to incite, encourage, or assist, esp. [sic] in

wrongdoing; incite means to provoke to action; compel means to force, drive, or constrain;

and coerce means to force to act or think in a given way by pressure, threats, or intimidation.

All of the words used are similar in meaning and require active and purposeful conduct.")

(internal quotations omitted).   There is a paucity of evidence in the record to support the conclusion that Defendant Damiano directed or participated directly in any of the alleged violations of which Plaintiffs complain.

However, this Court need not reach the aforementioned conclusion.  "An individual employee can not be found liable for discrimination under NJLAD unless the employer is first found liable."  Mitchell v. N.J. Lottery, No. 04-896, 2006 U.S. Dist. LEXIS 32559, at *35-36 (D.N.J. May 15, 2006) (quoting Hanani v. State of N.J., No. 03-3111, 2005 WL 1308231, at *16 (D.N.J. May 31, 2005)).  This Court finds that the Irvington Police Department and the Township of Irvington have not violated Plaintiffs' rights, pursuant to the NJLAD, see infra Sections IV.B.1 to 3; therefore, Defendant Damiano cannot be found liable for Plaintiffs' NJLAD claims.  See also Failla v. City of Passaic, 146 F.3d 149, 159 (3d Cir. 1998).

### 3.    *Civil Conspiracy*

Next, Damiano states that no evidence exists to show that he was involved in a conspiracy to deprive Plaintiffs of their civil rights.  (Damiano Mot. 17-18.)  In fact, there is no evidence of an agreement between any of the Defendants.

"Under New Jersey law, a civil conspiracy is a 'combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, and an overt act that results in damage.'"  Shan Indus., LLC v. Tyco Int'l (US), Inc., No. 04-1018, 2005 U.S. Dist. LEXIS 37983, at *33 (D.N.J. Sept. 9, 2005) (quoting Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005)).  Corporate employees, and officers of a governmental entity, however, cannot form a conspiracy with their employer when acting within the scope of

21

their employment.  Id. at *37 (citing Robinson v. Canterbury Vill., Inc., 848 F.2d 424, 431 (3d Cir. 1988)).  Similarly, employees or "officers acting within the scope of their employment cannot conspire together."  Sunkett v. Misci, 183 F. Supp. 2d 691, 722 (D.N.J. 2002).  This is true because "[a]n abstract entity can only act through its officers, so that a conspiracy between the officers and the entity is like a dance with one's own shadow."  Id.  The only exception to this principle "is if the officers are acting 'outside the course and scope of their employment,' in which case they are no longer representing the employer entity."  Id. (quoting Heffernan v. Hunter, 189 F.3d 405, 412 (3d Cir. 1999)).  "That is, an exception exists when the employees have acted for their sole personal benefit."  Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (internal quotation omitted).

Plaintiffs have failed to prove the most fundamental element of a civil conspiracy - - an agreement between two or more persons.  Shan Indus., LLC, 2005 U.S. Dist. LEXIS 37983, at *33.  There is no evidence before this Court that an agreement existed between Damiano and Chase, or any other person.  Even if there was evidence of an agreement, Plaintiffs, at most, allege a conspiracy of the Township, or in other words, the employer, with itself. Sunkett, 183 F. Supp. 2d at 722.  Unless Plaintiffs demonstrate that Defendants acted outside the scope of their employment, summary judgment would have to be granted in favor of Defendants.  No such evidence exists.  In fact, the gravamen of Plaintiffs' claims stem from Defendants' actions in their official capacity.  (See, e.g., Damiano SMF ¶ 16; Twp. SMF ¶¶ 5, 30; see also JDS Ex. P at 59:8-9, 59:21-24, 159:13-160:6; JDS Ex. O at 23:5-8, 24:2-9; JDS Ex. AA) (stating that Defendant Chase, in his role as the Chief of Police, assigned Stouch to the Communications Center; Defendant Chase, as Chief of Police, signed Stouch's

Preliminary Notice of Disciplinary Action, and ordered Stouch to complete an evaluation for

fitness for duty; and Defendant Damiano signed Stouch's Final Notice of Disciplinary Action,

a personnel document, in his capacity as representative for the assigning authority.)

Plaintiffs have failed to meet their burden of proof on their civil conspiracy claim.[11]

Celotex, 477 U.S. at 322-23.  This Court grants Defendant Damiano's motion for summary

judgment.

## B. Plaintiffs Fail to Prove that Defendants Chase, the Irvington Police Department, and the Township of Irvington Violated Their Rights

Defendants Chase, the Township, the PD, and Damiano, all claim that Plaintiffs failed

to carry their burden regarding their retaliation, hostile work environment, disability

discrimination, due process, privacy, and common law claims.  In short, Defendants argue that

Plaintiffs have not established a prima facie case for retaliation, hostile work environment,

disability discrimination, or unlawful search and seizure.  (Twp. Mot. 12-32, 37-53.)  In

addition, Defendants assert that the procedural mechanisms in place provided Stouch ample

opportunity to challenge his dismissal and, therefore, were sufficient to protect Stouch's due

process rights.  (Id. at 32-36.)  Finally, Defendants maintain that Plaintiffs did not file

adequate notice, as required by the New Jersey Tort Claims Act, regarding their common law

claims.  (Id. at 54-56.)

---

[11] This Court's ruling on Plaintiffs' civil conspiracy claim applies to all Defendants.  This Court will not repeat its reasoning or holding in the following discussion relating to the motion for summary judgment submitted by Defendants Chase, the Township, and the PD.

***1.        Retaliation Claims***

    a.        First Amendment

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001).  "While the government's role as employer gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large, this hand cannot act with impunity."  Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003) (quoting Baldassare, 250 F.3d at 294).  "Therefore, public employers cannot silence their employees simply because they disapprove of the content of such speech."  (Id.) (internal citation omitted).

However, a public employee's right of expression is not absolute.  Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997).  Courts use a three-step analysis to determine whether a public employee's First Amendment right has been violated by employer retaliation. Brennan, 350 F.3d at 412.  First, the public employee "must establish [that] the activity in question was protected" or, in other words, that the speech involved a matter of "public concern."  Baldassare, 250 F.3d at 195.  Second, the public employee "must demonstrate [that] his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees."  Id.  Third, the public employee "must show [that] the protected activity was a substantial or motivating factor in the alleged retaliatory action."[12]  Id.  The public employer may then rebut the claim

---

[12] The same three-prong test applies to Plaintiffs' NJLAD retaliation claim.  Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  Therefore, for the same reasons enunciated in this Court's discussion regarding Stouch's First Amendment retaliation claim, this Court grants Defendants' motion for summary judgment regarding Plaintiffs' NJLAD retaliation claim.

by establishing that, in the absence of the protected conduct, it would have reached the same

decision.  Id.

> A public employee's speech involves a matter of public concern if it can be fairly
> considered as relating to any matter of political, social, or other concern to the
> community.  In this respect, we focus on the content, form, and context of the
> activity in question.  The content of the speech may involve a matter of public
> concern if it attempts to bring to light actual or potential wrongdoing or breach of
> public trust on the part of government officials.

Id.  "This means that public speech cannot 'constitute merely personal grievances.'"  Brennan,

350 F.3d at 413 (quoting Feldman v. Phila. Housing Auth., 43 F.3d 823, 829 (3d Cir. 1994)).

Plaintiffs claim that all of Stouch's speech involved matters of public concern.  (Pls.' Resp. 6-

7.)  This Court disagrees.

Stouch spoke out about a number of issues, most of which constitute personal

grievances.  For example, Stouch complained that the PD's sick leave and grooming policies

were applied unfairly to him.  (JDS Ex. B at 180:9-16; JDS Ex. P at 39:4-5.)  Similarly,

Stouch objected to the conditions of the Communications Center.  (JDS Ex. P at 60:2-4.)

---

In addition, Stouch has waived his CEPA retaliation claim.  See N.J. STAT. ANN. § 34:19-8 ("the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law."); see also Young v. Schering Corp., 660 A.2d 1153, 1159-60 (N.J. 1995) ("We hold that the waiver exception means . . . that once a CEPA claim is instituted, any rights or claims for retaliatory discharge based on . . . State law, whether its origin is the Legislature, the courts, the common law or rules of court . . . are all waived. . . . Parallel claims based on those rights, privileges and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge."); Reynolds v. TCM Sweeping, Inc., 340 F. Supp. 2d 541, 545 (D.N.J. 2004) ("CEPA includes a waiver provision, which provides in part that if an employee chooses to file a claim under CEPA, he may be precluded from obtaining a remedy under a collective bargaining agreement, other contract, other state law, state rule, state regulation or common law.  The waiver provision of CEPA can prevent a former employee from pursuing both a CEPA claim *and* other causes of action for retaliatory discharge under law or under a [collective bargaining agreement].").

These complaints each involve an annoyance unique to Stouch, and is not the type of speech contemplated by the "public concern" factor. Brennan, 350 F.3d at 413 (speech on matters of public concern provides "information that may be vital to informed decision-making."). Even Stouch concedes this point. (JDS Ex. P at 35:16-25) (Stouch stating that the complaints regarding the conditions in the Communications Center do not relate to unprofessional police conduct.)

However, Stouch's speech concerning Sergeant Reiter's misuse of parking privileges; supervisors alleged falsification of daily logs, and failure to respond to 911 calls; and Officer Rice's threats all involve potential wrongdoing of government officials. Baldassare, 250 F.3d at 195. Defendants concede this fact. (Twp. Mot. 20) ("It is conceded that Stouch's speaking out about police misconduct is of public concern of the kind that is protected by the First Amendment.") Therefore, this Court will balance the interests of the employee and the employer.

Defendants claim that "Stouch's conduct was disruptive to discipline, militated against harmony in the department and unsettling to morale." (Id. at 17.) They argue that Stouch's interest in speaking freely about these matters is outweighed by their interest in preserving the efficiency of the PD. (Twp. Mot. 16-17.)

While "[c]ourts have given law enforcement agencies wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks," Ober v. Evanko, 80 F. App'x 196, 201 (3d Cir. 2003), the import of Stouch's speech concerning Sergeant Reiter, other supervisors, and Officer Rice, outweighs the PD's interest in maintaining harmony and morale, see Baldassare, 250 F.3d at

26

200 ("The First Amendment balancing test can hardly be controlled by a finding that disruption did or could occur.  An employee who exposes corruption in her office no doubt may disrupt and demoralize much of the office.  But it would be absurd to hold that the First Amendment generally authorizes officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.").

Similarly, the facts before this Court are unlike those in Evanko, where the employee spoke out about suspected misconduct outside of the established chain of command.  80 F. App'x at 201.  Here, Stouch expressed his concerns to his direct superiors, Chase and Internal Affairs.  (JDS Ex. B at 25:14-26:2, 127:5-7; JDS Ex. J.)  While the record also reflects that Stouch "complained openly, [and] spoke what was on [his] mind," it is unclear whether Stouch spoke to individuals outside of the chain of command.  Therefore, this Court holds that the balancing test weighs in favor of protecting Stouch's speech.

Plaintiffs' deficit remains, they have not presented evidence demonstrating that Stouch's speech on these alleged improprieties was a substantial or motivating factor in his termination.  Baldassare, 250 F.3d at 195.  First, the incident involving Sergeant Reiter occurred in 1997, more than six years before Stouch was dismissed.  (JDS Ex. B at 12:2-22.)  Second, while the exact time frame is unclear regarding Stouch's complaints that supervisors falsified reports and failed to report to 911 calls, the complaints seemingly began in 2001, when Stouch was first assigned to the Communications Center.  (JDS Ex. P at 59:8-9, 59:21-24.)  Third, although Stouch's complaints about supervisors may have continued into 2003, and although he filed a report about Officer Rice in July of 2003, just a few months before his termination, the temporal proximity alone is not enough to show that his speech was a

motivating factor in his ultimate dismissal.  <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503

(3d Cir. 1997) ("the timing of the allegedly retaliatory employment action cannot, standing

alone, support a finding of causal link.").  This is especially true considering that Internal

Affairs took seriously the complaint about Officer Rice, and investigated Stouch's allegations

fully.  (JDS Ex. I.)

  This is also true in light of the evidence supporting Defendants' decision to terminate

Stouch.  (JDS Ex. R at 45) (the hearing officer, Mr. Long, holding that the termination was

justified based on the reports from Drs. Krass and Motley.)  Plaintiffs have failed to carry their

burden; therefore, this Court grants summary judgment in favor of Defendants on Plaintiffs'

First Amendment retaliation claim.

    b. Americans with Disabilities Act

  In order "to state a *prima facie* case of retaliation under the ADA . . . , 'a plaintiff must

show: (1) protected employee activity; (2) adverse action by the employer either after or

contemporaneous with the employee's protected activity; and (3) a causal connection between

the employee's protected activity and the employer's action.'"  <u>Montanye v. Wissahickon Sch.</u>

<u>Dist.</u>, 218 F. App'x 126, 131 (3d Cir. 2007) (quoting <u>Fogleman v. Mercy Hosp.</u>, 283 F.3d 561,

567-68 (3d Cir. 2002)).  Plaintiffs' retaliation claim, pursuant to the Americans with

Disabilities Act, fails for the same reasons as their First Amendment retaliation claim - -

Plaintiffs fail to show that Stouch engaged in protected activity.  Further, even if Stouch

engaged in protected activity, there is no evidence indicating a causal connection between the

protected activity and Stouch's termination.

  First, Stouch has not shown that he was engaged in protected activity.  "[T]he ADA

retaliation provision protects any individual who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." <u>Krouse</u>, 126 F.3d at 502 (citing 42 U.S.C. § 12203(a)).  Stouch has not presented any evidence that he "opposed any act or practice made unlawful" by the ADA, or "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing" under the ADA . . . . " <u>Montanye</u>, 218 F. App'x at 131.  At most, Stouch states that he complained about the application of the PD's sick and injured leave policy.  (<u>See</u> <u>supra</u> Section II.C.)  However, Stouch has not alleged or presented evidence demonstrating that S.O.P. 1:13 violates the ADA, or even that the alleged selective enforcement of the policy against him violated his rights, pursuant to the ADA.

Even if Plaintiffs could show that Stouch was engaged in a protected activity, the record lacks evidence proving the causal link between that protected activity and Stouch's termination.  Plaintiffs' ADA retaliation claim fails because evidence in the record supports the conclusion, with no credible evidence to undercut such a determination, that Defendants' decision to terminate Stouch resulted from the evaluations of Drs. Krass and Motley.  (JDS Ex. R at 45.)

### 2.   *Hostile Work Environment Claim*

Stouch claims that Defendants created a hostile work environment because PD policies were selectively enforced against him, and because Defendants permitted Officer Rice to threaten him.  (Pls.' Resp. 24-25.)  Defendants counter and state that Stouch's hostile work environment claim fails because free speech protections do not afford Stouch protected status for a claim, pursuant to the NJLAD, for hostile work environment.  (Twp. Mot. 46.)  While

Stouch is correct that he can assert a hostile work environment claim, pursuant to the NJLAD, based on First Amendment protections, Stouch fails to carry his burden.

> To establish a cause of action under the [NJ]LAD based on hostile work environment, plaintiffs must satisfy each part of a four-part test. Specifically, they must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive.

Shepherd v. Hunterdon Dev. Ctr., 803 A.2d 611, 625 (N.J. 2002). A plaintiff is covered by the NJLAD, in a category of protected status, if the plaintiff claims a violation based on "race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual . . . . " N.J. STAT. ANN. § 10:5-12(a). A plaintiff is also protected if "that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act . . . . " Id. § 10:5-12(d).

Stouch cannot demonstrate that he is covered by any of the above protected statuses. First, Stouch has not alleged, or presented evidence showing that he is covered under § 10:5-12(a). Second, and as discussed supra Section IV.B.1.b, Stouch has not shown that he opposed a practice prohibited by the NJLAD, or filed a complaint, pursuant to this Act. Therefore, Stouch's hostile work environment claim fails, and this Court grants Defendants' motion for summary judgment on this cause of action.

### 3.      *Disability Discrimination Claims*

a.      Americans with Disabilities Act

"In order to make out the prima facie case under the ADA, a plaintiff must show that he (1) has a 'disability;' (2) is a 'qualified individual;' and (3) has suffered an adverse employment action because of that disability." Robinson v. Lockheed Martin Corp., 212 F. App'x 121, 123 (3d Cir. 2007) (citing Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002)).

To demonstrate that he has a disability, Stouch must show that:  "(1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such impairment; or (3) he was 'regarded as' having such an impairment by [the PD]." See id. (citing Marinelli v. City of Erie, Pa., 216 F.3d 354, 359 (3d Cir. 2000)).  Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i). A person is substantially limited in performing a major life activity if the person is

> unable to perform a major life activity that the average person in the general population can perform; or [is] significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

Id. § 1630.2(j).  The standard for qualifying as a person with a disability is demanding. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).

Stouch fails to make out a prima facie case under the ADA.  There is a dearth of evidence in the record to support a conclusion that Stouch is a person with a disability under the ADA.  The closest that this Court comes to reaching such a result occurs upon

consideration of Stouch's neck surgery and two spinal fusion surgeries.[13]  (JDS Ex. P at 71:2-

8, 73:1-16.)  However, Stouch does not provide any evidence to prove that he was, or is,

disabled.  In his brief, he simply states that he can make out a prima facie case of disability

because "[m]ajor life activities include the activity of working."  (Pls.' Resp. 16.)  While

Stouch is correct, he has not explained *how* he was unable to work, and *why* he was unable to

work.  Without such information, this Court relies on the record, which indicates that Stouch

was, in fact, able to work, and perform major life activities, after each surgery.  (See Twp.

SMF ¶¶ 5, 7; see also JDS Ex. P at 59:8-9, 59:21-24, 73:19-25 (showing that Stouch returned

to work in March of 2001, after having neck surgery, and in May of 2003, after having two

spinal fusion surgeries); JDS Ex. P. at 126:11-19, 130:18-131:18 (showing that upon his

termination from the PD, Stouch first obtained employment with Chopper Express/KVC

Logistics, and thereafter with the United Parcel Service).)  This Court will not imply a

disability, on a motion for summary judgment, where the record lacks evidence supporting

that one exists.

        b.      New Jersey Law Against Discrimination

Stouch's disability discrimination claim, pursuant to the NJLAD, similarly fails.  Like

claims under the ADA, a plaintiff claiming disability discrimination must first establish a

prima facie case of discrimination.  Ashton v. AT&T Corp., No. 03-3158, 2005 U.S. Dist.

LEXIS 21419, at *8 (D.N.J. Sept. 22, 2005).  "In cases involving the discriminatory discharge

of a disabled person, the employee must prove: (1) that [he] was handicapped; (2) that [he]

_____

[13] Stouch claims to be disabled only as a result of physical injuries sustained from the
August 2000 car accident, and lower back injuries in August of 2002.  (See generally First Am.
Compl. 13, 20, 22; see also Twp. SMF ¶¶ 4, 6; JDS Ex. P at 54:24-55:6, 73:1-16.)

was performing [his] job at a level that met [his] employer's legitimate expectations; (3) that

[he] nevertheless was fired; and (4) that the employer sought to have the same work completed

after [he] left."  Id. at *9.

The NJLAD recognizes various forms of discrimination, including discrimination

based on physical, and non-physical disabilities.  Viscik v. Fowler Equip. Co., 800 A.2d 826,

833 (N.J. 2002).   The Act defines "disability" as being a

> physical disability, infirmity, malformation or disfigurement which is caused by
> bodily injury, birth defect or illness including epilepsy and other seizure disorders,
> and which shall include, but not be limited to, any degree of paralysis, amputation,
> lack of physical coordination, . . . or any mental, psychological or developmental
> disability . . . which prevents the normal exercise of any bodily or mental function
> or is demonstrable, medically or psychologically, by accepted clinical or laboratory
> diagnostic techniques.

N.J. STAT. ANN. § 10:5-5(q).  This definition encompasses more forms of disabilities, and is

less stringent than the test employed by the ADA.  Viscik, 800 A.2d at 833 (citing Dale v. Boy

Scouts of Am., 734 A.2d 1196 (1999) ("Consistent with that approach, [the New Jersey

Supreme Court has] held that the overarching goal of [NJ]LAD to eliminate the cancer of

discrimination is to be achieved through a liberal construction of its provisions.")).  Therefore,

although Stouch does not specifically claim to be disabled, it is arguable that any limitation

resulting from his neck surgery and spinal fusion surgeries would qualify him as being a

person with a disability, as defined by the NJLAD.  Clowes v. Terminix Int'l, Inc., 538 A.2d

794, 803-04 (N.J. 1988) (citing Anderson v. Exxon Co., 446 A.2d 486, 491 (N.J. 1982)

(stating that spinal and back ailments constitute a handicap under NJLAD)).

However, summary judgment in favor of Defendants is warranted because Stouch fails

to rebut Defendants' non-discriminatory reason for his termination.  The McDonnell Douglas

balancing test requires that a Plaintiff rebut the legitimate, non-discriminatory reason for the adverse employment action, with evidence of pretext.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Here, Defendants state that based on two, independent medical evaluations, it was clear that Stouch was not psychologically fit to perform his responsibilities as a police officer.  (See JDS Ex. R.)  Stouch has not provided any evidence indicating that Defendants' response was a pretext for discrimination.

It is also important to note, that while the NJLAD encompasses many disabilities and attempts to afford liberal protection to disabled employees, the statute is not intended "to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment." N.J. STAT. ANN. § 10:5-2.1.  Therefore, and because Defendants provided evidence of a non-discriminatory reason for their employment decision, this Court grants summary judgment in favor of Defendants on Stouch's NJLAD disability discrimination claim.

### 4.    Due Process Claims

Plaintiffs purport to state procedural due process claims, pursuant to the Fifth and Fourteenth Amendments of the Constitution of the United States.  Both claims fail for the following reasons.

First, the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . . "  U.S. CONST. amend. V.  "However, 'the limitations of the Fifth Amendment restrict only federal governmental action.'"  Myers v. County of Somerset, 515 F. Supp. 2d 492, 504 (D.N.J. 2007) (quoting Nguyen v. U.S. Catholic Conference, 719 F.2d 52, 54 (3d Cir. 1983) (emphasis added)).  "Accordingly, the

rights provided by the Fifth Amendment do not apply to the actions of state officials." Id. (citation omitted).  Defendants are state officials or state governmental agencies.  Therefore, Defendants cannot maintain a claim against them, pursuant to the Fifth Amendment, and summary judgment must be granted in favor of Defendants.

Second, Plaintiffs' procedural due process claim under the Fourteenth Amendment fails because the procedural mechanisms in place were sufficient for Stouch to challenge his alleged deprivation.  Like the Fifth Amendment, the Fourteenth Amendment prohibits the denial of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  However, the Fourteenth Amendment protects against the deprivation of life, liberty, or property in the face of insufficient state procedures.  Nicholas v. Pa. State Univ., 227 F.3d 133, 138-39 (3d Cir. 2000).

"Defendants acknowledge that Stouch has a property interest in his employment which establishes a property interest protected by the Fourteenth Amendment."  (Twp. Mot. 33.)  Therefore, this Court must only consider whether "the procedures available to [Stouch] failed to provide him with due process of law."  Connors v. Connors, No. 07-2186, 2008 U.S. Dist. LEXIS 37610, at *15 (M.D. Pa. May 7, 2008).   In other words, procedural due process requires notice and a meaningful opportunity to be heard.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).

The PD's procedures comply with the requirements of the Fourteenth Amendment's due process protections.  First, Stouch was served with a Preliminary Notice of Disciplinary Action on November 21, 2003.  (Damiano SMF ¶ 21; see also JDS Ex. R at 1.)  This Notice specified the PD's reasons for issuing the Notice, as well as the likely result - - termination.

(JDS Ex. R at 1.)  The Notice also guaranteed a hearing on the matter prior to entry of a Final

Notice of Disciplinary Action.  (Id.)  The hearing was scheduled for December 16, 2003 at

10:00 a.m.  (Id.)  Stouch failed to appear at the hearing, and argues that "his work environment

became to[o] much for him to handle, the department beat him down, broke his spirit."  (Pls.'

Resp. 20.)

        However, even though Stouch did not appear, and Mr. Long issued a ruling against

him, Stouch was afforded additional procedural protections, and took advantage of each one.

Stouch appealed the Final Notice of Disciplinary Action, and conducted a full proceeding

before ALJ Klinger.  When ALJ Klinger affirmed Stouch's dismissal, he appealed her

decision.  (Damiano SMF ¶ 31; see also JDS Ex. U at 15.)  Next, Stouch appeared before the

Merit System Board.  Although the Merit System Board affirmed ALJ Klinger's decision,

(Damiano SMF ¶ 31; see also JDS Ex. BB at 5), Stouch could and did seek recourse in this

Court.  These procedures provided Stouch with ample opportunity to be heard and present his

case.  For these reasons, this Court enters summary judgment in favor of Defendants on

Stouch's due process claims.

        **5.    *Fourth Amendment Claim***

        The Fourth Amendment provides "[t]he right of the people to be secure in their

persons, [and] houses, . . . against unreasonable searches and seizures . . . . " U.S. CONST.

amend. IV.  "Reasonableness under the Fourth Amendment 'depends on all of the

circumstances surrounding the search or seizure and the nature of the search or seizure itself.'"

Cann v. Haymann, No. 07-2416, 2008 U.S. Dist. LEXIS 43065, at *18 (D.N.J. June 2, 2008)

(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)).  "Thus, the

permissibility of a particular practice is judged by balancing its intrusion on the individual's

Fourth Amendment interests against its promotion of legitimate governmental interests." Id.

(internal citation omitted).

"Searches and seizures of government employers or supervisors of the private property

of their employees . . . are subject to the restraints of the Fourth Amendment." O'Connor v.

Ortega, 480 U.S. 709, 715 (1987).  "Unlawful search and seizure claims require proof of an

unconstitutional invasion of a plaintiff's reasonable expectation of privacy or a deprivation of

his or her interest in property." Ober v. Miller, No. 04-1669, 2007 U.S. Dist. LEXIS 93236, at

*54 (M.D. Pa. Dec. 18, 2007).  While a public employee's privacy interest in his workplace is

generally less than that found at the home, or other contexts, O'Connor, 480 U.S. at 717, "[a]

public employee's reasonable expectation of privacy may be reduced or eliminated by

legitimate regulations or by office practices and procedures. . . . A public employee's

reasonable expectation of privacy may also be reduced if that employee is involved in an

industry that is regulated pervasively to ensure safety." Miller, 2007 U.S. Dist. LEXIS 93236,

at *55-56.

Stouch claims that his Fourth Amendment rights were violated when officers came to

his house to perform "sick checks."  (Pls.' Resp. 17-19.)  Stouch's claim fails, however,

because Defendants had an internal policy, with a legitimate basis, which "eliminated

[Stouch's] reasonable expectation of privacy." Miller, 2007 U.S. Dist. LEXIS 93236, at *58.

Although the alleged invasion occurred at Stouch's home, S.O.P. 1:13 authorized the PD to

send officers to perform "sick checks" for employees out on leave.  (JDS Ex. E at 5.)  This

policy serves the legitimate purpose of ensuring that employees who claim to be ill or

recovering from an injury sustained at work are, in fact, ill or recovering.

Similarly, the policy puts all employees on notice that "sick checks" may be performed.  Miller, 2007 U.S. Dist. LEXIS 93236, at *59.  Stouch does not deny that he was aware of the policy, but instead claims that the policy is an unreasonable infringement on his privacy rights.  (Pls.' Resp. 17; see also JDS Ex. P at 121:3-126:10 (Stouch stating that "sick checks had been performed at his home as early as 1997, and that he understood S.O.P. 1:13 to require certain procedures, including random visits to an officer's home, or other place of recuperation, to confirm compliance with the policy).)  This Court disagrees.  Stouch has not presented any evidence to show that the PD came onto Stouch's property for any reason other than to perform a "sick check."  In addition, Stouch fails to demonstrate that the PD abused this policy, or selectively enforced it against him.  (See JDS Ex. CC; see also JDS Ex. C at 393:20-396:9) (showing that Stouch posted No Trespass signs after one "sick check" was performed.)

Next, Stouch claims that his Fourth Amendment rights were violated when Internal Affairs officers traveled to his home to retrieve Stouch's government-issued gun.  Stouch argues that the officers appeared "with guns at the ready, a video camera, [and] no written request to surrender the weapon[,] but a demand that the weapon be surrendered."  (First Am. Compl. ¶ 21(k).)  Defendants do not dispute this.  (Twp. SMF ¶ 29.)  This fact, however, does not revive Plaintiffs' claim.

Stouch admits that when the order to surrender his weapon was first made, he refused.  (JDS Ex. P 115:9-11 ("Q.  So you refused to bring the weapon into Irvington, right?  A.  That is correct.").)  He refused this order even though it came from his superior, Sergeant Amanda

38

Koontz.  (Id. at 113:21-114:7.)  Stouch's claim must fail.

The PD has a legitimate interest in requiring its officers to comply with direct orders, especially one to surrender a service weapon.  Policeman's Benevolent Ass'n of N.J., Local 318 v. Twp. of Wash., 850 F.2d 133, 141 (3d Cir. 1988) (stating that township police officers are part of a quasi-military organization, and subject to extensive regulations, including conduct for their private lives, which is required to instill confidence in the public).  This interest eliminates Stouch's expectation of privacy despite the alleged invasion occurring at Stouch's home.  Chi. Fire Fighters Union, Local 2 v. City of Chicago, 717 F. Supp. 1314, 1318 (N.D. Ill. 1989 (stating that an "[e]mployee's expectations of privacy are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of the employees.").

Similarly, it must be noted that the PD requested that Stouch surrender the weapon at the police department itself.  (JDS Ex. P at 114:8-11.)  Stouch refused.  (Id. at 114:12-16.)  No alleged invasion would have occurred if Stouch had complied with the PD's initial request.

This Court grants Defendants' motion for summary judgment on Stouch's Fourth Amendment claim.

### 6.     *Common Law Claims*

Finally, Defendants argue that Plaintiffs' remaining common law tort claims - - tortious interference with economic opportunity; negligent hiring, supervision, and retention; and loss of consortium - - fail because Plaintiffs did not provide the requisite notice, pursuant to the New Jersey Tort Claims Act.  This Court agrees.

"To bring an action in tort against a 'public entity or public employee' in New Jersey,

the claimant must file a notice of claim with the entity within ninety days of the accrual of the claim or else be 'forever barred' from asserting that cause of action."  County Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 174 (3d Cir. 2006) (citing N.J. STAT. ANN. §§ 59:8-3, 59:8-8; Moon v. Warren Haven Nursing Home, 867 A.2d 1174, 1176 (N.J. 2005)).  This Act requires that a notice of claim include the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" "[a] general description of the injury, damage or loss incurred;" "[t]he name or names of the public entity, employee, or employees causing the injury;" and the amount of damages claimed.  N.J. STAT. ANN. § 59:8-4.

Plaintiffs do not dispute that they failed to file the appropriate notice, as required under the New Jersey Tort Claims Act.  (Pls.' Resp. 27-28.)  However, they state that "this actual suit should count as notice."  (Id. at 28.)  Plaintiffs' response is misguided.

The New Jersey Tort Claims Act provides very specific guidelines in which suits against a governmental entity must comply.  See generally N.J. STAT. ANN. 59:8-1 to -11.  These guidelines afford protections to governmental entities, and permit them an opportunity to redress claims prior to a formal lawsuit being instituted.  N.J. STAT. ANN. § 59:8-8 (stating that "*[a]fter* the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law.") (emphasis added).  Plaintiffs' failure to file the requisite notice deprived the Township and PD an opportunity to redress Plaintiffs' claims.

Similarly, Plaintiffs have provided this Court with no explanation or reason demonstrating an extraordinary circumstance.  N.J. STAT. ANN. § 59:8-9 (stating that

"[a]pplication to the court for permission to file a late notice of claim shall be made upon

motion supported by affidavits based upon personal knowledge of the affiant showing

sufficient reasons constituting extraordinary circumstances for his failure to file notice of

claim within the period of time prescribed by section 59:8-8 . . . ").

This Court grants Defendants' motion for summary judgment with respect to

Plaintiffs' common law tort claims.  There is no basis to make any findings in Plaintiffs' favor

that would allow noncompliance with the New Jersey Tort Claims Act.

## V.  <u>CONCLUSION</u>

For the reasons stated above, both motions for summary judgment, pursuant to FED. R.

CIV. P. 56, are granted.


Date: July 14, 2008

　　　　　　　　　　　　　　　　 S/Joseph A. Greenaway, Jr.　　　　　　　
　　　　　　　　　　　　　　　　 JOSEPH A. GREENAWAY, JR., U.S.D.J.